727 So.2d 613 (1998)
Deborah BATSON, Eula Maye Batson and Billy M. Batson
v.
SOUTH LOUISIANA MEDICAL CENTER and State of Louisiana, Through The Department of Health and Human Resources.
No. 98 CA 0038.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
*614 Michael Samanie, Herbert W. Barnes, Houma, for Plaintiffs-Appellees Deborah Batson, et al.
Gregory C. Weiss, Kathryne Caraway, New Orleans, for Defendants-Appellants State of Louisiana and South Louisiana Medical Center.
Peter Sperling, New Orleans, for Defendants Medforce Physical Therapy Services, Inc., et al.
Joseph A. Reilly, Lafayette, for Defendant Sunbelt Physical Therapy.
Richard Ieyoub, Baton Rouge, Attorney General on behalf of the State of Louisiana, through the Louisiana Department of Justice Defendant.
Amos H. Davis, Baton Rouge, for Defendant Chicago Insurance Company.
Kristin E. Hendericks, Metairie, for Defendant Medforce International, Inc.
BEFORE: FITZSIMMONS and GUIDRY, JJ., and CHIASSON[1], J. Pro Tem.
GUIDRY, J.
In this medical malpractice action, the defendants, South Louisiana Medical Center (SLMC) and the State of Louisiana, through the Department of Health and Human Resources *615 (collectively appellants), appeal from the trial court's judgment in favor of the plaintiffs, Deborah Batson, Eula Maye Batson and Billy Batson. The trial court found that Deborah Batson (Ms. Batson) suffered multiple separate and unrelated injuries and damages as the result of the state's breach of the standard of care, which was comprised of separate and unrelated acts of negligence by the state's employees and/or agents. Plaintiffs answer this appeal asserting that the Malpractice Liability for State Services Act (MLSSA) is unconstitutional and seeking an increase in damages.

FACTS AND PROCEDURAL HISTORY
On or about July 26, 1990, Ms. Batson had a surgical procedure performed on her at SLMC in Houma, Louisiana. Following the surgical procedure, Ms. Batson contracted sepsis. As a result of the sepsis, Ms. Batson suffered severe complications and spent several months in the intensive care unit (ICU). In February of 1991, Ms. Batson was transferred from the ICU to a hospital room, where she remained until her discharge in April of 1991. During this hospital stay, Ms. Batson developed a hip fracture, decubitus ulcers, flexion contractures and became incontinent.
On July 19, 1991, Ms. Batson and her parents, Eula Maye Batson and Billy M. Batson filed a petition for damages, naming as defendants, SLMC and the State of Louisiana, through the Department of Health and Human Resources, Office of Hospitals. Plaintiffs alleged that during her hospitalization, Ms. Batson developed severe complications resulting in near-death and severe disabling injuries. Plaintiffs further alleged that Ms. Batson's injuries were the result of SLMC's negligence. Plaintiffs asserted that SLMC's negligence resulted from a failure to properly and timely diagnose Ms. Batson's condition, failure to provide adequate and competent medical care, failure to provide adequate and competent medical testing, failure to provide the proper standard of care required, and failure to obtain informed consent.
On March 23, 1993, plaintiffs filed a first supplemental and amending petition for damages naming as additional defendants: Louisiana Physical Therapy and Athletic Rehabilitation, Inc.; Medforce International, Inc.; Medforce Physical Therapy Services, Inc.; Sunbelt Physical Therapy Services, Inc., Robert Rowe; and Leah Angelito.[2] Plaintiffs contended that Medforce International, Inc. merged with Medforce Physical Therapy Services, Inc. Plaintiffs alleged that SLMC had contracted with Louisiana Physical Therapy and Athletic Rehabilitation, Inc., and under the contract, Louisiana Physical Therapy and Athletic Rehabilitation, Inc. would provide SLMC with physical therapists and rehabilitation services. It was alleged that Louisiana Physical Therapy and Athletic Rehabilitation, Inc. then contracted with Medforce International, Inc., and under this contract, Medforce International, Inc. was to provide Louisiana Physical Therapy and Athletic Rehabilitation, Inc. with inpatient and outpatient physical therapists to perform services at SLMC. It was also alleged that Robert Rowe (Mr. Rowe), a physical therapist, was an employee of Medforce International, Inc. and/or Louisiana Physical Therapy and Athletic Rehabilitation, Inc. and provided physical therapy services to Ms. Batson at SLMC. Plaintiffs contended that Ms. Batson developed severe complications as a result of the actions of Mr. Rowe and Medforce International, Inc. Plaintiffs further contended that Medforce International, Inc. and/or Louisiana Physical Therapy and Athletic Rehabilitation, Inc. were vicariously liable for the negligent acts and omissions of Mr. Rowe.
Plaintiffs also asserted that Medforce International, Inc. contracted with Sunbelt Physical Therapy Services (Sunbelt). It was alleged that under this contract, Sunbelt would provide physical therapists to Medforce International, Inc., and in turn, Medforce International, Inc. would use these physical therapists to provide physical therapy *616 services at SLMC. Plaintiffs asserted that Leah Angelito (Ms. Angelito), a physical therapist, was an employee of Sunbelt, Medforce International, Inc., and/or Louisiana Physical Therapy and Athletic Rehabilitation, Inc., and performed physical therapy on Ms. Batson at SLMC. Plaintiffs alleged that Ms. Batson developed severe complications as a result of the physical therapy treatment, or lack thereof, received from Ms. Angelito. Plaintiffs contended that Sunbelt, Medforce International, Inc., and/or Louisiana Physical Therapy and Athletic Rehabilitation, Inc. are vicariously liable for the negligent acts and omissions of Ms. Angelito.
Plaintiffs asserted that SLMC contracted with Medforce Physical Therapy Services, Inc. to receive physical therapy and rehabilitation services from Medforce Physical Therapy Services, Inc. Plaintiffs further alleged that while Ms. Batson was in SLMC, Ms. Batson developed severe complications as a result of the actions and inactions of Medforce Physical Therapy Services, Inc.
Medforce International, Inc., Medforce Physical Therapy Services, Inc. and Mr. Rowe filed an answer generally denying plaintiffs' allegations. On July 29, 1994, appellants filed an answer generally denying plaintiffs' allegations. SLMC and the State filed a cross-claim, naming as defendants: Medforce International, Inc.; Medforce Physical Therapy Services, Inc.; Sunbelt; Mr. Rowe; and Ms. Angelito. SLMC and the State alleged that, if liable, they were entitled to indemnity and/or contribution of at least $1,000,000.00 and unlimited future medical care and related benefits from the cross-claim defendants, pursuant to a hold harmless agreement with Medforce International, Inc. SLMC further alleged that a contract existed with Medforce International, Inc. which required Medforce International, Inc. to provide physical therapists to Louisiana Physical Therapy and Athletic Rehabilitation, Inc. for both inpatient and outpatient physical therapy services at SLMC. It was contended that during Ms. Batson's stay in the ICU, she developed extensive flexion contractures that were caused solely by the fault and/or negligence of agents and/or personnel of Medforce International, Inc. by: failing to carry out the physicians' orders which required physical therapy on Ms. Batson four times per day; failing to timely advise the physicians at SLMC of the progressive nature of Ms. Batson's flexion contractures; and failing to recommend that therapy be initiated seven days per week due to the progressive nature of the flexion contractures.
Thereafter, plaintiffs amended their petition to add St. Paul Fire and Marine Insurance Company (St.Paul) as a defendant, alleging that St. Paul provided a policy of liability insurance covering Medforce Physical Therapy Services, Inc. Plaintiffs also alleged that Ms. Angelito was the borrowed servant of Medforce Physical Therapy Services, Inc. Plaintiffs further alleged that Medforce Physical Therapy Services, Inc. was vicariously liable for the negligent acts and omissions of Ms. Angelito.
On March 21, 1994, the plaintiffs filed a supplemental and amending petition asserting that LSA-R.S. 13:5106(B)(1) and LSA-R.S. 40:1299.39(F) are unconstitutional in that they fail to provide equal protection and due process of law, and, further, these provisions violate the prohibition of the defense of sovereign immunity.
A four-week trial was held from July 8, through August 2, 1996. Appellants were tried by the bench and all other defendants were tried by the jury. Prior to the jury returning a verdict, plaintiffs entered into a high-low settlement agreement with Medforce Physical Therapy Services, Inc.; Louisiana Physical Therapy and Athletic Rehabilitation, Inc., Mr. Rowe and Ms. Angelito. According to the agreement, a low-end amount of $750,000.00 would be paid if the jury returned a verdict less than $750,000.00, even if there was a finding of no fault on the part of these defendants. The high-end of the agreement was $1,750,000.00, meaning that if the jury returned a damages award greater than this figure, relative to these defendants' liability, the plaintiffs had agreed to accept a settlement amount of $1,750,000.00.
Following deliberations, the jury returned a verdict, finding that SLMC, Medforce, Mr. Rowe and Ms. Angelito were all liable in *617 their treatment of Ms. Batson relative to her flexion contractures. Fault was assessed as follows: SLMC with 90% of the fault; Medforce with 9.7% of the fault; Mr. Rowe with 0.2% of the fault; and Ms. Angelito with 0.1% of the fault. Ms. Batson was awarded the following damages: 1) past medical expenses, $536,949.91; 2) future medical expenses, $1,000,000.00; 3) physical pain and suffering, past and future, $50,000.00; and 4) mental pain and suffering, past and future, $50,000.00. Additionally, SLMC was found liable for Ms. Batson's infection (sepsis), and damages of $867,318.03 were awarded; SLMC was found liable for Ms. Batson's decubitus ulcers, and damages of $40,000.00 were awarded; and no defendants were found liable for Ms. Batson's fractured hip or incontinence.
With respect to the bench trial, the trial court rendered judgment in favor of plaintiffs and against appellants on April 15, 1997. Appellants were found 100% at fault in the cause of Ms. Batson's sepsis, hearing loss, brain injuries, and incontinence and Ms. Batson was awarded $349,791.03, past medical expenses; $87,049.75, future medical expenses; and $500,000.00, all other general and special damages; and Billy M. Batson and Eula Maye Batson were awarded $10,000.00 each for loss of consortium. Additionally, appellants were found 60% at fault in causing Ms. Batson's flexion contracture injuries and Ms. Batson was awarded $322,169.95, past medical expenses; $900,000.00, future medical expenses; and $500,000.00, all other general and special damages; and Billy M. Batson and Eula Maye Batson were awarded $30,000.00 each for loss of consortium. Finally, appellants were found 70% at fault in causing Ms. Batson's decubitus ulcers and Ms. Batson was awarded $78,352.36, past medical expenses; $70,000.00, future medical expenses, and $500,000.00, general damages; and Billy M. Batson and Eula Maye Batson were awarded $10,000.00 each for loss of consortium.

ASSIGNMENTS OF ERROR
Appellants assert the following assignments of error:
1. The trial court incorrectly applied more than one statutory cap on damages in this matter, in derogation of LSA-R.S. 40:1299.39;
2. The trial court erred in assessing general damages against SLMC when all defendants were state qualified health care providers, and when Ms. Batson will receive the full amount to which she is entitled from the physical therapist defendants;
3. The trial court erred in awarding Ms. Batson's parents loss of consortium damages over and above the statutory cap on damages;
4. The trial court erred in awarding specific amounts for future medicals, in derogation of LSA-R.S. 40:1299.39.
Plaintiffs have answered this appeal and assert that the statutory cap provided for in the MLSSA is violative of the Louisiana Constitution. Particularly, plaintiffs assert that the cap violates Article I, Section 3, Article I, Section 22, Article XII, Section 10, and Article III, Section 12. Plaintiffs also seek an increase in the damages awarded.

DISCUSSION

Multiple CapsGeneral Damages and Loss of Consortium Awards
Appellants assert that the trial court incorrectly applied more than one cap on damages in this case. For the reasons set forth in Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709, and discussed below, the trial court's judgment applying multiple caps is reversed and one $500,000.00 cap is applied for all injuries and/or claims of plaintiffs.
The Louisiana Supreme Court recently decided Conerly, which dealt with the issue of whether multiple caps are allowed under LSA-R.S. 40:1299.39 for wrongful death and survival action claims arising in the context of a medical malpractice action. The plaintiffs in Conerly, Timothy and Claudia Conerly, in a medical malpractice action sought damages for injuries sustained by their infant daughter immediately prior to her birth at E.A. Conway Hospital, a hospital owned and operated by the state. The infant's injuries resulted in her death the day before her *618 fifth birthday, and the petition was amended to allege a survival action and add wrongful death claims of the parents. The trial court held that the statutory cap was constitutional and that the total amount of all general damages would be capped at $500,000.00. On appeal, the second circuit affirmed the trial court's judgment on the issues of negligence, causation, and assessment of damages, but found that the cap applicable to the survival claim should be separate from the parents' wrongful death claims. The supreme court granted the state's writ application for the sole purpose of considering the legal issue of whether multiple medical malpractice caps are allowed under LSA-R.S. 40:1299.39 for wrongful death and survival action claims.
The supreme court articulated the law on statutory construction as follows:
[B]ecause the MLSSA limits the liability of certain health care providers in derogation of the general rights of tort victims, any ambiguities in the Act should be strictly construed against coverage. On the other hand, legislation is a solemn expression of legislative will, and therefore, interpretation of a law involves primarily the search for the legislature's intent. Hence, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. When the language of the law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. Additionally, laws on the same subject matter must be interpreted in reference to each other. If application of the foregoing rules of interpretation fails to illuminate definitively the legislature's intent, only then should the rule of strict construction apply to the interpretation of laws in derogation of common rights such as the MLSSA.
Conerly, 714 So.2d at 710-11 (citations omitted). The court then noted that the word "any," which is used repeatedly in Sections (B) and (C) of the statute, renders the statute susceptible of several meanings. Because "any" can mean one, some or all, the pertinent phrases can be read as providing a single cap for each individual action which arises from an act of medical malpractice or as providing a single cap for all actions which arise from an act of medical malpractice. Therefore, the court was required to determine the legislature's intent and purpose for enacting the statute.
Looking at the legislative history of the MLSSA, the court determined that the legislature intended to provide for the limitation of liability per act of malpractice. Additionally, language which was added to Sub-Section (D), in 1988, stated that a claimant suing under the MLSSA recovers only, not more than, to the same extent as one suing under the private law. The language under the Louisiana Medical Malpractice Act (MMA), which applies to actions against private health care providers, clearly indicates that a party can recover only $500,000.00 (one cap) for all malpractice claims. Accordingly, the court determined that when there is an act of malpractice causing the death of a patient, and plaintiffs bring survival action and wrongful death action claims, LSA-R.S. 40:1299.39 provides there is but one $500,000.00 cap applicable to all claims.
Although the case sub judice involves injuries that did not result in death (and thus no survival action or wrongful death claims), this case falls squarely under Conerly. It involves the same Section of LSA-R.S. 40:1299.39 at issue in Conerly. Moreover, in any medical malpractice case under the MMA, only one $500,000 .00 recovery for general damages is allowed. Thus, the same rules of construction would apply and the same legislative intent and purpose is applicable. Accordingly, the trial court's judgment awarding multiple caps for each of Ms. Batson's injuries is amended to cap Ms. Batson's damages at $500,000.00, and the awards for the loss of consortium claims of her parents are reversed.[3]

*619 State Qualified Health Care Provider

Appellants also aver that the trial court erred in awarding additional damages against SLMC when the plaintiffs will receive the full amount they are entitled to recover from the physical therapist defendants. As previously discussed, plaintiffs entered into a high-low settlement agreement with the physical therapist defendants, which would allow plaintiffs to recover an amount in excess of the $500,000.00 cap. For this reason, appellants argue that plaintiffs should not be able to recover any damages from SLMC. For the reasons discussed above, particularly with respect to the conclusion that there is a single statutory cap, appellants' argument has merit. Plaintiffs may only recover one $500,000.00 general damage award.
Plaintiffs have attempted to argue that the statutory limitation does not apply because the state (specifically Medforce, Robert Rowe, and St. Paul Insurance Company) failed to plead and/or prove that its health care providers are entitled to the protection under MLSSA. According to plaintiffs, the statutory cap under MLSSA is an affirmative defense which must be pled or else it is waived. This argument is without merit.
Although there are no cases on this issue involving MLSSA, the Fourth Circuit in Remet v. Martin, 97-0895 (La.App. 4th Cir.12/10/97), 705 So.2d 1132, dealt with this issue in the context of the private counterpart to MLSSA, MMA, which applies to health care providers in the private sector.
One of the issues raised in Remet was whether qualified health care provider status can be waived if not raised in the answer or through exceptions. The court looked to the definition of an affirmative defensea defense that raises new matter which, assuming the allegations in the petition are true, constitutes a defense to the action and will have the effect of defeating a plaintiffs demand on its meritsand concluded that qualified health care provider status is not an affirmative defense because such status does not defeat the plaintiff's demand. Remet, 705 So.2d at 1134.
As in Remet under the MMA, qualified health care provider status under the MLSSA is not waived if not specifically pled because such status cannot defeat a plaintiff's demand. Qualified health care provider status is not an affirmative defense. It is merely a limitation on liability.

Award for Future Medical Expenses
Next, appellants argue that the trial court erred in awarding an amount for Ms. Batson's future medical expenses. This argument is without merit. LSA-R.S. 40:1299.39(F)(1) specifically states that the court's judgment "shall include a recitation that the patient is or is not in need of future medical care and related benefits and the amount thereof." Furthermore, the mere articulation of a dollar amount in no way affects the procedures established whereby medical benefits are paid.

Constitutional Challenges

Article I, Section 3 and Article I, Section 22 (Equal Protection/Access)
Plaintiffs challenge the statutory cap provided for in the MLSSA as an unconstitutional violation of the equal protection and access to courts provisions of the Louisiana Constitution. Article I, Section 3 of the Louisiana Constitution guarantees equal protection of the laws. Article I, Section 22 provides:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
Under the equal protection analysis when no fundamental rights are involved, the constitutional test is whether the statute is reasonably related to furthering general social interests. Butler v. Flint Hosp. of Dillard University, 607 So.2d 517, 519 (La.1992), *620 cert. denied, Butler v. Medley, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).
The Louisiana Supreme Court addressed this same challenge in Butler, and with three justices dissenting (Calogero, C.J., Lemmon and Dennis, JJ.), determined that the cap does not violate equal protection or access to courts. Applying the rational basis test articulated above, the Court determined that the state's purposeproviding compensation for medical malpractice victimswas furthered by the cap. Therefore, the cap is not constitutionally infirm.
While it is true that the cap treats plaintiffs differently (i.e., one group of victims with injuries evaluated below $500,000.00 can obtain full recovery and another group with injuries evaluated above $500,000.00 cannot obtain full recovery), the discrimination is not arbitrary, capricious and unreasonable. With the cap, Louisiana may now offer those most severely injured by medical malpractice three benefits: (1) greater likelihood that the offending physician or other health care provider has malpractice insurance; (2) greater assurance of collection from a solvent fund; and (3) payment of all medical care and related benefits. Butler, 607 So.2d at 521. Thus, for the reasons set forth in Butler, plaintiffs' equal protection and access to courts challenge is without merit.

Article XII, Section 10 (Sovereign Immunity)
Plaintiffs also argue that the statutory cap is violative of Article XII, Section 10's proscription against sovereign immunity. Article XII, Section 10 provides, in pertinent part:
(A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
Plaintiffs rely on Chamberlain v. State Through Dept. of Transp. and Development, 624 So.2d 874 (La.1993), as the basis for their argument that the statutory cap violates the proscription against sovereign immunity. Chamberlain was a tort suit brought by the parents of Chad Chamberlain, who was seriously injured in the Houma Canal, against the Department of Transportation and Development (DOTD). The plaintiffs challenged the constitutionality of LSA-R.S. 13:5106(B)(1),[4] which provides the state immunity from liability for general damages in excess of $500,000. The trial court and the court of appeal upheld the constitutionality of the statute. Both DOTD and the plaintiffs applied for writs, and the Louisiana Supreme Court granted the plaintiffs' application for the primary purpose of addressing the question of the statute's constitutionality.
After a review of the legislative goal and purpose for enacting the statutory ceiling on damages, the Court articulated the rule that the constitution takes precedence over any statutes. The Court then examined Article XII, Section 10 to determine the meaning of the proscription against immunity from liability found therein. To determine this meaning, the Court examined the historical evolution of the provision and found that Section 10(A) is a mandatory prohibition, which is self-executing, limiting the legislature's power to legislate in the field by removing the substantive parameters of the constitutionally conferred right from legislative control. Thus, while the legislature is free to enact procedural requirements for enforcing the rights granted under Section 10(A), it cannot enact substantive requirements that would curtail, abridge, impair or burden the exercise of such constitutionally conferred rights. Because LSA-R.S. 13:5106(B)(1) is substantive, in that it has the effect of changing the law regarding the amount of recoverable tort damages, the legislature overstepped its boundary. According to the Court, "a ceiling on non-economic damages, like LSA-R.S. 13:5106(B)(1), partially resurrects sovereign immunity because it declares, in essence, that injury inflicted by a governmental tortfeasor is not legally cognizable beyond the ceiling amount. Stated otherwise, when immunity has been abolished, decreasing recovery from *621 full compensation to a maximum ceiling partially resurrects immunity." Chamberlain, 624 So.2d at 884. Thus, the statutory ceiling was found to be unconstitutional.
However, this question was more recently and specifically addressed by the Louisiana Supreme Court in Williams v. State, Dept. of Health and Hospitals, 97-0055 (La.12/2/97), 703 So.2d 579. The plaintiffs in Williams, a medical malpractice suit, attacked the constitutionality of the $500,000.00 cap in favor of the state. The trial court determined that the portion of LSA-R.S. 40:1299.39 which imposes the $500,000.00 statutory medical malpractice cap on damages awarded against a state health care provider contravenes Article XII, Section 10(A). The state then directly appealed to the supreme court and contended, in part, that LSA-R.S. 40:1299.39 is constitutional because it does not contravene the proscription against sovereign immunity.
The supreme court reversed the trial court on the basis that non-governmental tortfeasors are afforded the same substantive defenses as governmental tortfeasors. According to the Court, in prohibiting immunity from liability as well as from suit, the framers of Article XII, Section 10(A) clearly intended that the state not be afforded substantive defenses, unavailable to private litigants, based simply on its governmental status. Williams, 703 So.2d at 582. Thus, if a statute imparts to the governmental tortfeasor the same limitation of liability that is provided to non-governmental tortfeasors who commit medical malpractice, then the statute is not violative of the proscription against sovereign immunity. In other words, sovereign immunity mandates that the law of the land be applied equally to the sovereign and the private litigant. Thus, for the reasons articulated by the supreme court in Williams, we now affirm the trial court's conclusion that the $500,000.00 statutory cap is not violative of Article XII, Section 10.

Article III, Section 12 (Special Laws)
Finally, plaintiffs argue that the statutory cap is violative of the prohibition against special laws articulated in Article III, Section 12. Particularly, plaintiffs argue that the cap is a special law in that it "affect[s] the estates of minors or persons under disabilities" or "grant[s] to any private corporation, association, or individual any special or exclusive right, privilege, or immunity." Special or local laws are those that are limited to a particular locality or affects only certain parishes. See City of Bogalusa v. Washington Parish Sales/Use Tax Centralization Com'n, 94-2413 (La.App. 1st Cir.6/23/95), 658 So.2d 1336; State v. Slay, 370 So.2d 508 (La.1979). Clearly, the statutory cap does not violate these constitutional provisions because the cap does not fall under the definition of a local or special law.

DECREE
For the foregoing reasons, the portion of the trial court's judgment awarding loss of consortium damages to Eula Maye Batson and Billy M. Batson is reversed and judgment is rendered in favor of appellants, SLMC and the state, dismissing Eula Maye Batson's and Billy M. Batson's suit against them at Eula Maye Batson's and Billy M. Batson's cost. The portion of the trial court's judgment in favor of Ms. Batson is amended to reduce the awarded damages from $1,500,000.00 to $500,000.00. In all other respects the judgment is affirmed. Costs of this appeal are assessed to plaintiffs, Deborah Batson, Eula Maye Batson, and Billy M. Batson.
REVERSED AND RENDERED IN PART; AMENDED IN PART; AND, AS AMENDED, AFFIRMED IN PART.
FITZSIMMONS, J., concurs, and assigns reasons.
FITZSIMMONS, Judge, concurring, with reasons.
I am respectfully compelled to concur in the result.
The MMA and the MLSSA are different in many respects. For example, malpractice is defined in different terms. For the private providers, malpractice specifically includes only unintentional acts; for public providers, it is tied to a standard of care. See LSA-R.S. 40:1299.39 A(4) & 40:1299.41 A(8). Gross negligence or a wanton act that results in an injury excludes the public actor from *622 the definition of a "state health care provider," under the MLSSA. LSA-R.S. 40:1299.39 A(1)(a)(iv)(cc) & K. Presumably, the patient could sue the excluded provider separately, but the provider loses the protection of the MLSSA. Id.
In a case with successive acts of malpractice by different providers, the MLSSA also reads differently from the MMA. A provision of the MLSSA can be interpreted as a limitation of liability that can be applied per singular "act" of malpractice or per individual "state health care provider." LSA-R.S. 40:1299.39 F & G. Each act or each provider would trigger another cap, resulting in multiple caps. However, another provision of the MLSSA provides that the patient injured by the public system cannot recover more than he could under the private system of health care. LSA-R.S. 40:1299.39 D. Thus, we must review the articles in both the public and the private malpractice law to determine whether multiple caps are allowed under the circumstances of this case.
The MMA provides the answer. "The total amount recoverable for all malpractice claims for injuries to ... a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." LSA-R.S. 40:1299.42 B(1). Thus, LSA-R.S. 40:1299 .42 B(1) mandates a limitation per "patient" for the private providers, and, pursuant to LSA-R.S. 40:1299.39 D, for the public providers, as well.
Since the Louisiana Legislature and the Louisiana Supreme Court, in Williams v. State, Department of Health and Hospitals, 97-0055 (La.12/2/97), 703 So.2d 579, have indicated that there shall be no distinction between the applicability of the private and public malpractice acts, it is apparent that acts of gross negligence should also remove the private health care provider from the sanctuary of the Medical Malpractice Act. A cause of action given to one, must also be afforded to the other.
The focal point here is that certain health care providers in this case are subject to separate suit, and they are divorced from the protection of the MLSSA, if their acts rise to the level of gross negligence. If this is true in the public realm where there are pressures to render care to a populous economically deprived, then those persons, patients, who incur gross negligence within private institutions where they are paying dearly for services, should also lose the penumbra of the private Medical Malpractice Act benefits. Let there be no doubt that the Malpractice Act was confected, designed, and enacted to protect the good, decent, hardworking, diligent physician who bears the human mantle and can err. It was not designed to protect those institutions which seek to profit as a corporate entity with shareholders and a demand that the profit margin and not "health care" be the true "bottom line." Hopefully, the legislature will recognize the vast distinction between the Sisters of Charity with no desire for profit, whose motivation is service, and a hospital run by a corporation purely for profit. Perhaps, the legislature, that saw the need to protect conscientious doctors, will also respond to the need to protect patients from the small percentage of providers whose acts escape malpractice, and rise to the level of gross negligence or worse. Truly incompetent or uncaring providers, public or private, should not be allowed to seek refuge under the umbrella of limited liability.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The first supplemental and amending petition also added as defendants, Action Temporary Services, Inc. and Temporary Solutions, Inc. Plaintiffs alleged that these defendants were businesses that had merged with Medforce International, Inc. However, these defendants are not parties in this appeal.
[3] We note that an ex parte motion for substitution of parties was filed with this court on July 29, 1998 by the heirs of Eula Maye Batson. This motion was referred to the merits on November 2, 1998. However, because we now reverse the loss of consortium awards, we pretermit a decision on the motion to substitute parties.
[4] LSA-R.S. 13:5106(B)(1) provides:

In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars.