GUIDRY, J.
[2The State of Louisiana, through the Department of Transportation and Development (DOTD), appeals a jury verdict and a judgment notwithstanding the verdict (JNOV) rendered in this matter. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
On February 11, 1996, Jerry Goza attended a Mardi Gras parade with his wife, Gladys P. Goza, in Addis, Louisiana, where he consumed at least one or two beers. Following the parade, Mr. Goza and his wife went to Marley Marina, a local bar, where they danced and socialized with friends, some of whom had attended the same Mardi Gras parade. Around 7:45 p.m. that night, Mr. Goza, who had previously left the bar in his wife’s car, was traveling westbound on Louisiana Highway 989-1 (a state-owned highway commonly known as Choctaw Road) on his way back to Marley Marina, when he traveled off the paved roadway at the juncture where Louisiana Highway 989-1 intersected at a sharp curve with Louisiana Highway 989-2 (commonly known as Ellwood Road). Mr. Goza drove off the roadway into a cane field adjacent to the road where his vehicle eventually ran into a ditch, struck a culvert, and flipped over. Mr. Goza sustained serious injuries, requiring surgery and rehabilitative treatment.
The Gozas filed a petition for damages against the DOTD and the Parish of West Baton Rouge, alleging that the design, construction, and signage of Louisiana Highway 989-1 were defective, but they later filed a motion to dismiss their claims against the Parish of West Baton Rouge. A “Restrictive Judgment of Dismissal” was signed by the trial court on April 3, 1997, dismissing the Parish of West Baton Rouge from the suit.
The remaining defendant, the DOTD, answered the petition generally denying liability for the plaintiffs’ claims; however, after a period of extensive discovery and other pre-trial proceedings, the DOTD amended its answer to add a [ ¡¡third-party demand against the Parish of West Baton Rouge. In the third-party demand, the DOTD alleged that portions of the location on which the accident occurred were maintained and controlled by the Parish of West Baton Rouge. The West Baton Rouge Parish Council answered the third-party demand to deny the allegations of liability asserted against it.
Thereafter, the West Baton Rouge Parish Council, which observed that it had been wrongfully identified in prior pleadings as the Parish of West Baton Rouge, filed a motion for summary judgment, alleging there was no evidentiary basis on which the West Baton Rouge Parish Council could be held liable. The trial court agreed, and rendered summary judgment in favor of the West Baton Rouge Parish Council, dismissing the DOTD’s third-party demand. The DOTD appealed the sum *326 mary judgment, which judgment was affirmed by this court on review, Goza v. Parish of West Baton Rouge, 05-1040 (La. App. 1st Cir. 5/5/06), 930 So.2d 1243(unpublished opinion), and a subsequent writ application to the supreme court was denied. Goza v. Parish of West Baton Rouge, 06-1221 (La.6/14/06), 929 So.2d 1272.
The matter thus proceeded to trial in October 2006 against the DOTD alone. Following a four-day jury trial, the jury rendered a verdict in favor of the plaintiffs, but allocated only 25 percent fault to the DOTD. The jury awarded Mr. Goza the following amounts:
Loss of enjoyment of life and permanent
disability $100,000.00
Future medical expenses $500,000.00
Past medical expenses $326,001.81
Lost wages, past and future $678,195.00
The jury did not award Mr. Goza any other general damages. The jury awarded Mrs. Goza $100,000.00 for loss of consortium.
|4In response to the jury’s verdict, the DOTD filed a motion for JNOV. The trial court granted the motion in part and amended the jury’s verdict to award Mr. Goza $600,000.00 in general damages and to decrease the award of future medical expenses to $150,000.00. In all other respects, the trial court maintained the awards and the fault allocations rendered by the jury. The DOTD appeals the original jury verdict and the JNOV.
ASSIGNMENTS OF ERROR
In this appeal, the DOTD contends that the trial court committed error in admitting uniform motor vehicle accident reports, which it attempted to exclude pursuant to a motion in limine that was denied by the trial court, and in restricting its ability and right to present evidence opposing the accident reports. The DOTD further contends that it was error to apportion any fault to it and to award Mr. Goza future medical expenses.
DISCUSSION
We began our review of this appeal by first considering the DOTD’s third assignment of error relative to the trial court’s denial of its motion in limine to exclude from evidence the Uniform Motor Vehicle Accident Reports (accident reports) that the plaintiff obtained from the West Baton Rouge Parish Sheriffs Office. Relying on 23 U.S.C. § 409 and Long v. State, Department of Transportation and Development, 04-0485 (La.6/29/05), 916 So.2d 87, the DOTD contends that the trial court erred in allowing the plaintiff to introduce copies of the accident reports at trial.
The federal statute, 23 U.S.C. § 409, was enacted by Congress “to prevent the unauthorized disclosure of information that States compile in good faith to meet the purposes of Federal aid highway programs to eliminate or reduce hazardous roadway conditions.” Long, 04-0485 at 10-11, 916 So.2d at 94-95. Accordingly, the statute provides:
fiNoWithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in *327 such reports, surveys, schedules, lists, or data.
The definitive pronouncement of the proper scope and application of 23 U.S.C. § 409 is found in the United States Supreme Court’s opinion of Pierce County, Washington v. Guillen, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003). In that case, the United States Supreme Court declared:
§ 409 protects not just the information an agency generates, ie., compiles, for § 152 [1] purposes, but also any information that an agency collects from other sources for § 152 purposes. And, it also takes a narrower view of the privilege by making it inapplicable to information compiled or collected for purposes unrelated to § 152 and held by agencies that are not pursuing § 152 objectives. We therefore adopt this interpretation.
Guillen, 537 U.S. at 145-46, 123 S.Ct. at 730-31 (emphasis added).
Evidentiary privileges are in derogation of the search for truth and thus such privileges must be strictly construed. Sevario v. State, Department of Transportation and Development, 98-1302, p. 10 (La.App. 1st Cir.11/10/99), 752 So.2d 221, 229, writ denied, 99-3457 (La.4/7/00), 759 So.2d 760, and writs not considered, 99-3638, 00-0044 (La.4/7/00), 759 So.2d 81, 82.
|fiIn Long, the issue before the court was whether the trial court erred in admitting into evidence three letters between the DOTD and the mayor of Boutain that were obtained from the mayor’s office. The DOTD argued that the letters should have been held inadmissible pursuant to 23 U.S.C. § 409. Long, 04-0485 at 13, 916 So.2d at 96. The court in Long agreed, finding that the “three letters represent information necessary for the commencement of the upgrade [of the] roadway/railroad crossing, and thus, the letters effectuate the purpose of the federal safety program.” Long, 04-0485 at 20, 916 So.2d at 100. The court therefore held that the letters were “protected from discovery and ... inadmissible under 23 U.S.C. § 409[,]” even though the letters were in the hands of an agency not charged with the responsibility of developing highway safety construction improvement projects that utilize Federal-aid highway funds. Long, 04-0485 at 20, 916 So.2d at 100.
We find the Long case distinguishable from the matter before us. The court in Long expressly found that the letters in that case “were compiled and collected by the DOTD for purposes related to funding through ... a federal safety program[,]” because each of the letters specifically addressed the commencement of the process of selecting the roadway/railway crossing for improvement. Long, 04-0485 at 19-20, 916 So.2d at 99-100. As discussed hereafter, we hold that there has been no such showing regarding the accident reports at issue.
The Louisiana Supreme Court specifically held in Long that “[t]he privilege afforded to state agencies in § 409 and the documents at issue must not be viewed in a vacuum; rather, inquiry should be directed toward the purpose for which the docu- *328 merits are created.” Long, 04-0485 at 20, 916 So.2d at 100. While the DOTD created the accident report form and trains local law enforcement officers to properly complete the form to fulfill its obligations under 23 U.S.C. § 152, the information added to the form by law enforcement is compiled and collected | pursuant to their statutory duty to investigate and report accidents. It is that information compiled by law enforcement pursuant to its statutory duty that the DOTD seeks to exclude in this matter.
To support its assertion that the accident reports were “compiled and collected ... for the purpose of developing any highway safety construction improvement project, which may be implemented utilizing Federal-aid highway funds,” the DOTD introduced the testimony of Hadid Shirazi, a traffic engineer and Hazard Elimination Funds coordinator for the DOTD. Mr. Shirazi related how the accident reporting form used by local law enforcement officials to record accident information is a uniform document developed by the DOTD to be used by all law enforcement agencies in the state at all levels of government. Furthermore, Mr. Shirazi testified that federal highway safety funds were and continue to be used to revise the accident reporting form and to train law enforcement officers how to properly complete the form.
Mr. Shirazi’s testimony establishes that the forms designed by the DOTD made it more convenient for the agency to glean information from the accident reports, but it does not negate the general duty on the part of law enforcement to investigate and report accidents, as required by statute. See La. R.S. 32:398. To the extent that law enforcement accommodates the DOTD by adopting the uniform accident report forms designed by the DOTD for use in accident investigation, such action alone is insufficient to transform the normal accident investigation duties of local law enforcement agencies into an act of “information compilation and collection for § 152 purposes.” As such, we find no merit in the DOTD’s argument that the mere completion of the form designed by the DOTD, and completed in accordance with training provided by the DOTD, makes the completion of an accident report by local law enforcement officials an act of compiling or collecting information for § 152 purposes.
|sAs observed by the Court in Guillen: [T]he text of § 409 evinces no intent to make plaintiffs worse off than they would have been had § 152 funding never existed. Put differently, there is no reason to interpret § 409 as prohibiting the disclosure of information compiled or collected for purposes unrelated to § 152, held by government agencies not involved in administering § 152, if, before § 152 was adopted, plaintiffs would have been free to obtain such information from those very agencies.
Guillen, 537 U.S. at 146, 123 S.Ct. at 731. We therefore conclude that the trial court properly determined that the accident reports in the possession of the West Baton Rouge Parish Sheriffs Office were not “compiled or collected” for purposes of 23 U.S.C. § 152, and thus were not subject to exclusion from evidence on the basis of 23 U.S.C. § 409.
We find, however, that the trial court did err in denying the DOTD’s motion in limine on the basis of La. C.E. art. 803. That article provides, in pertinent part:
Art. 803. Hearsay exceptions; availability of declarant immaterial
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
*329 (b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel. [Emphasis added.]
Hence, the accident reports introduced by the plaintiffs at trial are considered hearsay evidence, and therefore should have been considered inadmissible, see La. C.E. art. 802; however, for the following reasons, we find the trial court’s error in admitting the accident reports was harmless. See Ross v. Noble, 442 So.2d 1180, 1184 (La.App. 1st Cir.1983).
Generally, when liability is premised on the DOTD’s ownership of an allegedly defective thing, a plaintiff may recover damages from the DOTD, a public entity, based on La. C.C. art. 2317, as limited by La. R.S. 9:2800. The ^portion of La. R.S. 9:2800 pertinent to the DOTD’s liability, as the statute provided at the time of Mr. Goza’s accident,[2] stated:
B. ... [N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
D. A violation of the rules and regulations promulgated by a public entity is not negligence per se.
E.“Public entity” means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instru-mentalities, officers, officials, and employees of such political subdivisions. Public entity also includes housing authorities, as defined in R.S. 40:382(1), and their commissioners and other officers and employees.
Thus, in order to find the DOTD liable, the plaintiffs had to prove (1) the DOTD had custody of the thing that caused the plaintiffs’ damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time; and (4) the defect was a cause-in-fact of the plaintiffs’ injuries. Cormier v. Comeaux, 98-2378, pp. 5-6 (La.7/7/99), 748 So.2d 1123, 1127.
Under La. R.S. 9:2800, constructive notice is defined as the existence of facts which imply actual knowledge, and this definition allows a person to infer actual knowledge on the part of a public entity when the facts demonstrate that the defective condition existed for such a period of time that the defect should have been discovered and repaired. Morris v. State, Department of Transportation, 94-^545,in p. 6 (La.App. 1st Cir.10/6/95), 664 So.2d 1192, 1196, writ denied, 95-2982 (La.2/9/96), 667 So.2d 537. While the DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can the DOTD escape liability by negligently failing to discover that which is easily discoverable. Brown v. *330 Louisiana Indemnity Company, 97-1344, p. 8 (La.3/4/98), 707 So.2d 1240,1244.
The accident reports were offered by the plaintiffs to establish that the DOTD had constructive notice of the allegedly defective roadway. But there is other evidence in the record by which this element can be established, particularly, the testimony of Larry Straub and Jason Campbell.
At trial, Mr. Straub testified that he had lived less than a mile from the site of the accident from about 1971-72 to around 2002. He testified that over the years he had seen “several accidents in that corner and several people that my grandfather ... would have ... come ... wanting to get pulled out of that ditch.” For some of the accidents, Mr. Straub testified that “I’ve seen State Police back there on several different accidents.” Mr. Straub also related that despite his familiarity with the area, he had an accident “in that curve” in 1995, and that his wife had wrecked his Trans Am in the same location in 1979.
In February 1995, exactly a year to the month before Mr. Goza’s accident, Mr. Campbell testified that he was involved in an accident that was similar to that of Mr. Goza’s. Mr. Campbell testified that he was 17 years old at the time and that he was traveling on the unfamiliar road as a result of having missed the turn to his girlfriend’s house while driving her home on the night of the accident. He stated that “[t]he cane field had been cut and it was a very deceptive view; it looked like the road kept going. When I got into the curve and noticed that it was a curve I made a hard left turn, at which point the rear of my truck lost control and went into |T1the ditch causing my truck to flip over.” The State Police investigated Mr. Campbell’s accident.
Thus, the testimony of Mr. Straub and Mr. Campbell not only established a history of car accidents at the same location as Mr. Goza’s accident, but Mr. Straub’s testimony in particular established that the problem presented by the curve had been in existence for a significant period of time. Therefore, as the foregoing evidence would be sufficient to support a finding of constructive notice, we find that the trial court’s erroneous ruling admitting the accident reports was, at most, harmless error. See also La. C.E. art. 103 A; Wright v. Bennett, 04-1944, p. 6 (La.App. 1st Cir.9/28/05), 924 So.2d 178,183.
The DOTD also made the following complaint about the evidentiary rulings of the trial court in its first assignment of error:
Where, in a road hazard claim against the Louisiana Department of Transportation and Development, the plaintiff is allowed to introduce motor vehicle accident reports spanning a nine year period [1990-1998] five years for which there were no reports, including four year consecutively, [1991-1994] it was legal error for the court to prohibit the defendant from eliciting testimony regarding the four year accident-hiatus, and additionally, legal error to instruct the jury to disregard testimony from the Defendant’s expert regarding that same four year period ...
In like manner the court erred in not allowing defendant to make arguments to the jury to the effect that the lack of reported accidents during that period was probative of the highway’s safety....
At trial, the DOTD objected to the trial court’s exclusion of the evidence referred to in its first assignment of error, but it did not seek to proffer the evidence that it alleges was improperly excluded. It is well settled that error may not be predicated upon a ruling that excludes evidence *331 unless a substantial right of a party is affected and the substance of the evidence was made known to the court by counsel. La. C.E. art. 103 A(2). In those instances, it is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion was erroneous. Hurts v. Woodis, 95-2166, p. |,¡,12 (La.App. 1st Cir.6/28/96), 676 So.2d 1166, 1175. The DOTD neglected to proffer the evidence it contends was erroneously excluded. Based on its failure to proffer the evidence, we decline to review this assignment of error.
In its second assignment of error, the DOTD asserts that it was error to apportion it with any fault. As previously stated, the trial jury allocated the DOTD with 25 percent fault in this matter. In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, p. 8 (La.1/16/96), 666 So.2d 607, 611. In the present matter, the primary conduct of the parties to be compared is the alleged intoxication of Mr. Goza and the alleged defectiveness of the roadway at issue.

INTOXICATION

The first contention of the DOTD under its second assignment of error is that it should not have been assigned any fault because it alleges that the accident was caused solely as a result of Mr. Goza’s intoxication. In Petre v. State, Department of Transportation and Development, 01-0876, p. 12 (La.4/3/02), 817 So.2d 1107, 1114, the Louisiana Supreme Court quoted with approval the following reasoning of the appellate court:
While no one would take issue with the fact that [the plaintiff’s] unacceptable and illegal actions in driving while intoxicated should be weighed heavily against her in considering the extent of DOTD’s duty to her, intoxication alone is not enough to automatically prevent her from recovering for DOTD’s fault. It is merely a factor to consider in Louisiana’s comparative negligence scheme.
| ¡¡¡Likewise, in the matter before us, the evidence presented to the jury regarding Mr. Goza’s alleged state of being intoxicated was merely a factor to be considered by the jury under our comparative fault scheme, as was the alleged road defect. Moreover, the record reveals that the issue of whether Mr. Goza was legally intoxicated was highly disputed in the proceedings below.
Mrs. Goza testified that during all the time she had known Mr. Goza, she had never seen him drink more than one or two beers and that he never drank hard liquor. She further testified that on the date of the accident, she and Mr. Goza went shopping and had purchased bread, ice and a case of beer that they took with them to a Mardi Gras parade in Addis, Louisiana. While she stated that she did not personally observe Mr. Goza consume any beer that day, she nevertheless assumed that Mr. Goza had consumed two beers on the date of the accident, because when she looked in the vehicle after it was returned to her years later, she found the case of beer that had been purchased still in the vehicle with two cans missing from the case. Other witnesses who saw Mr. Goza at the parade and later at Marley Marina also testified that they did not see *332 Mr. Goza consuming any alcoholic beverages.
Wanzie Everett, a friend of Mr. Goza’s who rode on one of the floats in the Mardi Gras parade the Gozas attended on the date of the accident, testified that every year all of the float members for that particular parade would gather at Marley Marina where there would be “food and all that.” Mrs. Everett said she danced with Mr. Goza at Marley Marina, and during that time, she did not smell alcohol on his breath nor did he appear to be impaired in any way. She testified that she had never seen Mr. Goza drunk and that on the day of the accident, she “did not see him with any drinks in his hand at all.” As Mrs. Everett described, Mr. Goza “seemed perfectly fine,” and based on her observation, she would not have had any problem riding in the car with him on the date of the accident.
114Anthony Hernandez, a witness who had worked with Mr. Goza prior to the accident, testified that he had seen the Gozas at the Mardi Gras parade on the date of the accident. Mr. Hernandez stated that he was at the parade when the Gozas arrived and upon their arrival, he and his wife crossed the street to greet the Gozas. During the parade, however, Mr. Hernandez stated that he and his wife viewed the parade from the opposite side of the street from the Gozas and he saw Mr. Goza “off and on,” or as he explained “pretty much as each float went by.” Mr. Hernandez testified that based on what he observed, Mr. Goza just enjoyed the parade and socialized with those present, as “Jerry was a well-known person. You hardly went anywhere with him that somebody didn’t know him.” Mr. Hernandez stated that at the parade, he did not smell alcohol on Mr. Goza’s breath and he did not observe Mr. Goza drinking any beer or liquor, nor did Mr. Goza appear to be intoxicated. Both Mr. Hernandez and another witness, Linda Smith, testified about their knowledge and experience of Mr. Goza acting as the designated driver at various social occasions.
Part of the evidence offered by the DOTD to establish that Mr. Goza was intoxicated at the time of the accident were his certified medical records from the Baton Rouge General Medical Center, the hospital where Mr. Goza was rushed to on the night of the accident. One of the documents included in Mr. Goza’s medical records described his blood-alcohol screening results at 9:80 p.m. on February 11, 1996 as 180. Medical experts at trial translated that number to mean 180 milligrams of alcohol per 100 cubic centimeters of blood or a 0.18 blood-alcohol concentration level; however, annotated to that reported number is a footnote that states, in part, “non-medieolegal method used.”
The plaintiffs presented an expert in the fields of toxicology, pathology, and general medicine, Dr. Ernest Lykissa, to testify regarding the validity of the blood-alcohol results reported in Mr. Goza’s medical records. Dr. Lykissa stated that he | ^reviewed all of Mr. Goza’s medical records, Mr. Goza’s ambulance records, and the depositions of some witnesses, including the deposition of Dr. Bruce Wilkerson, the attending physician that treated Mr. Goza at the Baton Rouge General Medical Center on the night of the accident, to form his opinion. Based on the evidence reviewed, Dr. Lykissa opined that the blood-alcohol results reported in Mr. Goza’s medical records were not valid. Primarily, his opinion was based on the footnote “non-medicolegal method used,” which he said indicated that the reading was invalid. Dr. Lykissa further stated that the reason the test results would be considered invalid or inaccurate is because *333 no chain of custody was established for the blood sample tested.
On cross examination, Dr. Lykissa admitted that the test results were accurate for the purpose identifying the presence of alcohol relative to the medical treatment rendered, but he disclaimed the accuracy of the test results for any other purposes, especially in light of the annotation “non-medicolegal method used.” He stated as a qualitative[3] test, the results were accurate. He explained that the test results would serve a purpose medically of alerting healthcare professionals, particularly anesthetists, to the presence of alcohol in the patient.
Additionally, Dr. Lykissa opined that the nature of Mr. Goza’s injury also affected the accuracy of the test results, because science has shown that post-traumatically, alcohol has a tendency to elevate falsely as opposed to prior to the trauma. As he explained:
Based on Dr. Wilkerson[,] we did [hear] that Mr. Goza’s body, during the time that he was trying to save his life, he did by [a] miracle, he was able to tell us that actually he was going through a platonic death; his body was already shutting down. He did say that the muscles were shutting down, the kidneys were shutting down; so the body, what it does marvelously is it makes a decision, it takes priority, it says, wait a minute, I’m bleeding, let me take all the blood out of you guys because I don’t need you right now and let me move it over there because | lfithat’s where I need you. So the body will just drain literally kidney, liver, spleen and take in all the blood into the chest cavity to maintain that blood pressure so necessary to keep the heart pumping. And in doing so[,] it was draining them from all that alcohol, if that was there, and alcohol loves water. And remember, they replaced all his bloodstream with saline. So everything drained out. So we do not have anymore of the, what the so called, you know, compartmentalization of alcohol, where it goes, most of it in the liver, some of it in the kidney, some of it in the brain and so on and so forth. You get it all out in your bloodstream and, therefore, you getting a falsehood. Anything that has been published into making the sciences (inaudible) over and over again that post-traumatic alcohol measurements in the blood are always falsely elevated. And I’m going back on the science that it is.
The DOTD presented the testimony of Dr. Ronald Padgett, accepted by the court as an expert in the areas of medicine and pathology, to dispute Dr. Lykissa’s opinion. On cross examination, Dr. Padgett also acknowledged that the lab test of Mr. Goza’s blood was done for medical reasons and not for the purposes of a court appearance, but he nevertheless testified that based on his review of Mr. Goza’s medical records, there was no reason to discredit the accuracy of the blood-alcohol concentration reported.
It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. Harris v. State ex rel. Department of Transportation and Development, 07-1566, p. 25 (La.App. 1st Cir.11/10/08), 997 So.2d 849, 866, writ denied, 08-2886 (La.2/6/09), 999 So.2d 785. *334 The manifest error standard of review requires that even where the reviewing court may believe that its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal where the record merely demonstrates conflicting testimony as to the facts at issue, and the fact finder chooses to believe one version, rather than the other. Salvant v. State, 05-2126, p. 17 (La.7/6/06), 935 So.2d 646, 658.
|17The plaintiffs presented fact and expert witness testimony to discredit DOTD’s medical and expert testimony regarding Mr. Goza’s alleged intoxication and the affect such alleged intoxication would have on Mr. Goza’s ability to drive. Thus, while the record before us establishes that Mr. Goza did consume some alcohol on the date of the accident, the amount of alcohol consumed and his degree of intoxication, if any, is disputed based on the evidence presented. As such, the weight to be given this conflicting evidence was clearly a matter for the jury to decide. Further, the evidence presented establishes that this is not a case where there is uncontroverted evidence of a highly intoxicated driver, and so the evidence presented is not such as to require a finding that Mr. Goza is solely at fault. Cf Forbes v. Cockerham, 08-0762 (La.1/21/09), 5 So.3d 839.

ROAD DEFECT

The DOTD further contends that the plaintiffs failed to present any evidence to show that Mr. Goza’s accident occurred as a result of defects in the roadway. While the DOTD does not contest the jury’s determination that the roadway was defective on appeal, it does argue that the plaintiffs failed to present any evidence proving that the defects caused Mr. Goza’s accident.
Whether an unreasonably dangerous defect caused the plaintiffs’ damages is a finding of fact and an appellate court may not overturn a jury’s finding of fact in the absence of manifest error or unless clearly wrong. Shilling v. State ex rel. Department of Transportation and Development, 05-0172, p. 7 (La.App. 1st Cir.12/22/05), 928 So.2d 95, 100, writ denied, 06-0151 (La.4/24/06), 926 So.2d 541. Generally, when more than one cause combines to bring about a plaintiffs harm, the substantial factor test is used to determine whether a particular defendant’s conduct is a factor in bringing about plaintiffs harm. Scott v. Pyles, 99-1775, p. 9 (La.App. 1st Cir.10/25/00), 770 So.2d 492, 499, writ denied, 00-3222 (La.1/26/01), 782 So.2d 633.
|1RAs a result of the severity of the injuries sustained by Mr. Goza in the accident, he had no memory of the accident or how it occurred. The accident was a single-car accident with no witnesses. At trial, the plaintiffs presented the testimony of John Bates, accepted by the trial court as an expert in civil engineering specializing in traffic accident reconstruction and the evaluation of highway design and maintenance, to establish that the roadway in question contained several defects that caused it to be unreasonably dangerous. The primary defect observed by Mr. Bates was the compound[4] curvature of Louisiana Highway 989-1 at the point where it connects with Louisiana Highway 989-2, making the curve in the road quite sharp.
Mr. Bates testified that the danger presented by the curve under the blanket of night, when Mr. Goza’s accident occurred, was increased by the lack of lighting, inad *335 equate signage alerting motorists of the significant curve, an excessive speed limit, and failure to install protective barriers to keep the unwary motorist on the roadway. Mr. Bates formed his opinion based on his personal observation of the accident location, listening to and reading the testimony of various witnesses, and reviewing the seven accident reports offered into evidence,[5] including Mr. Goza’s accident report. Based on the evidence considered, Mr. Bates opined that the sharpness of the curve was “exactly what created problems out there for ... we |19know seven accident reports.” Mr. Bates explained:
A driver entering the curve is going to get a sense about how much he needs to turn the wheel, perhaps adjusting his speed a bit, and it should be that same one all the way around, the same degree of turning your wheel. But in this case, where you have that ever-increasing sharpness of the curve a driver will enter as Mr. Goza did here and feel like he has it mastered, but then as he gets a little bit into the curve, the curve has gotten too sharp for him and now he’s going to head into that ditch. If there had been warning of, hey, here’s what it’s like; ... if he’d been warned then he could do something about it.
He also stated, “[tjhat’s what causes the injury. One has lost the control on the highway due to the sharpness of the curve, but the injury is the result of going down into that deep ditch in essence having a head-on collision with the bottom of the ditch and then rolling over.”
Mr. Bates stated that the risks presented by the defects in the roadway were amplified by Mr. Goza’s lack of familiarity with the road, which he determined based on the following reasons:
The testimony as I understand it was that two years prior to this accident [Mr. Goza] had been through the curve once, one time going away, one time coming back, that’s twice in daylight. Then on the night of the accident he had gone through in daylight; that would be the third time and had come back in daylight, the fourth time. And then at the time of the accident he went through at nighttime. So he had four times in two years that he had been through there. One trip you might say, one round trip two years ago, one round trip at the time of the accident, and the termination of it was the accident that occurred.
Thus, Mr. Bates opined that “the intoxication is not the culprit, it is the design of this roadway being so short of the curve....”
We find this evidence was sufficient to support the jury’s finding that the noted defects in the roadway contributed to the accident as Mr. Bates’ testimony related *336 those defects to the circumstances of Mr. Goza’s accident. We therefore reject the DOTD’s assertion that there was no proof of causation. See also Vallien v. State, Department of Transportation and Development, 01-0566, p. 6 (La.App. 3d Cir.3/27/02), 812 So.2d 894, 899, writs denied, 02-1184, 02-1198 (La]2n6/14/02), 818 So.2d 785 and 786; Scott, 99-1775 at 9-10, 770 So.2d at 499-500; Farbe v. Casualty Reciprocal Exchange, 99-341, pp. 7-8 (La.App. 3d Cir.10/27/99), 746 So.2d 228, 232-33, rev’d, in part on other grounds, 00-0076 (La.7/6/00), 765 So.2d 994.

FAULT COMPARISON

Therefore, having considered the evidence presented regarding the negligent conduct of each party, we can now consider whether the jury erred in its allocation of fault among the parties. In comparing the evidence of Mr. Goza’s conduct of having consumed alcohol and operating a vehicle on the date of the accident (although the amount of alcohol consumed and whether Mr. Goza was legally intoxicated is disputed) and the conduct of the DOTD in failing to decrease the speed limit and in failing to provide adequate lighting, signage, and protective barriers for the safety of unwary motorists on a roadway with such a sharp and dangerous curve, we cannot say that the trial jury erred in allocating the DOTD with some fault. The jury clearly weighed the evidence of Mr. Goza’s admitted alcohol consumption and disputed intoxication against the DOTD’s awareness of the defectiveness of the roadway resulting in accidents similar to that of Mr. Goza’s to find that the DOTD bore some liability in this matter. Moreover, as evidence of Mr. Goza’s alleged intoxication was highly disputed, coupled with evidence that the defective roadway contributed to Mr. Goza’s accident, we find the evidence is not so overwhelming as to mandate a finding that Mr. Goza’s negligent conduct of consuming alcohol and operating a vehicle be considered the sole cause of the accident at issue. Cf. Forbes, 08-0762, 5 So.3d 839. Therefore, we reject the DOTD’s assertion that the trial jury erred in allocating it with any fault.
In its final assignment of error, the DOTD contests the trial court’s ruling on JNOV to reduce rather than vacate the jury’s award of future medical expenses. We find no merit in this assignment of error.
| ⅞1 Louisiana Code of Civil Procedure article 1811(F) provides that a motion for judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both. In this case, the JNOV was granted on the issue of future medical damages. Typically, the standard of review of a JNOV on appeal is a two-prong inquiry. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Adams v. Parish of East Baton Rouge, 00-0424, p. 7 (La.App. 1st Cir.11/14/01), 804 So.2d 679, 687, writ denied, 02-0448 (La.4/19/02), 813 So.2d 1090.
In this case, the DOTD, in whose favor the JNOV was granted, does not contest the granting of the JNOV, but rather seeks a determination of whether the award rendered pursuant to the JNOV is manifestly erroneous. Therefore, we will *337 limit our review of this assignment of error to the second prong of the inquiry under the standard of review.[6]
An award of future medical expenses is justified if there is medical testimony that they are indicated and setting out their probable cost. Hanks v. Seale, 04-1485, p. 16 (La.6/17/05), 904 So.2d 662, 672. Nevertheless, when the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact | {.¿value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. Levy v. Bayou Indus. Maintenance Services, Inc, 03-0037, p. 9 (La.App. 1st Cir.9/26/03), 855 So.2d 968, 975, units denied, 03-3161, 03-3200 (La.2/6/04), 865 So.2d 724 and 727. In such a case, the court should award all future medical expenses that the medical evidence establishes that the plaintiff, more probable than not, will be required to incur. Hymel v. HMO of Louisiana, Inc., 06-0042, pp. 26-27 (La.App. 1st Cir.11/15/06), 951 So.2d 187, 206, unit denied, 06-2938 (La.2/16/07), 949 So.2d 425. Although future medical expenses must be established with some degree of certainty, they do not have to be established with absolute certainty, as an award for future medical expenses is by nature somewhat speculative. Grayson v. R.B. Ammon and Associates, Inc., 99-2597, p. 35 (La.App. 1st Cir.11/3/00), 778 So.2d 1, 23, units denied, 00-3270, 00-3311 (La.1/26/01), 782 So.2d 1026,1027.
In the matter before us, Mr. Goza presented the testimony of three of his treating doctors by video depositions that were played to the jury. Of the testimony presented, only the testimony of Dr. Gray W. Barrow is pertinent to the issue of the award of future medical expenses.[7] Dr. Barrow, a physiatrist or doctor of physical medicine, had been treating Mr. Goza for chronic pain symptoms in his chest, neck, low back and knees for approximately nine years at the time his deposition was taken in 2006. He testified that in the beginning, Mr. Goza’s treatment included physical therapy and epidural steroid injections, in addition to strong narcotic pain medications; however, at the time of Dr. Barrow’s deposition, the primary treatment regime being used was narcotic pain medications. DrJjgBarrow disclosed that Mr. Goza had been on various narcotic pain medications, including Methadone, Vicodin, Lortab, Percocet, MS Contin, and was presently using Oxycontin. As a result of Mr. Goza’s continuous need for narcotic pain medications, Dr. Barrow testified that Mr. Goza was seen “at least every three months just to manage his medications and make sure that things are going okay with him.” As Dr. Barrow explained,
[W]e treat pain now like we would treat a disease because it’s been shown that if you don’t adequately treat pain it can *338 affect almost every system in your body and shorten your life span. He certainly has chronic pain. So [Oxycontin is] a strong pain medication, but it’s also I think appropriate in his case and has given him an improved quality of life and allowed him to function better.
As for Mr. Goza’s long-term prognosis, Dr. Barrow stated that other than just continuing to be seen by a doctor of physical medicine, “if his condition worsens, the only thing I think he may need would possibly be a total knee replacement in the future, but I don’t think there’s any surgical remedy for his other problems, just medical management, which I’ve been doing.”
Based on Dr. Barrow’s testimony, we conclude that the trial court was not clearly wrong in finding that Mr. Goza was entitled to an award of future medical expenses, as Dr. Barrow’s testimony clearly indicates that future medical treatment will be required. Although Mr. Goza failed to present any evidence as to the specific cost of such future treatment, as previously stated, it is proper for the trial court to determine future medical expenses on the basis of the record, past medical expenses, and other evidence. Levy, 03-0037 at 9, 855 So.2d at 975. The parties stipulated that Mr. Goza’s past medical expenses were $326,001.81. Therefore, we find no error in the trial court’s JNOV award of future medical expenses in the amount of $150,000.00.
1 ^CONCLUSION
For the foregoing reasons, we affirm the jury’s verdict, as amended by the JNOV granted by the trial court. All costs of this appeal in the amount of $5,905.00 are assessed to the State of Louisiana, through the Department of Transportation and Development.
AFFIRMED.
WELCH, J., concurs and dissents with reasons assigned.

. The " § 152” referred to is 23 U.S.C. § 152, titled "Hazard elimination program,” which provides in pertinent part:
Each State shall conduct and systematically maintain an engineering survey of all public roads to identify hazardous locations, sections, and elements, including roadside obstacles and unmarked or poorly marked roads, which may constitute a danger to motorists, bicyclists, and pedestrians, assign priorities for the correction of such locations, sections, and elements, and establish and implement a schedule of projects for their improvement.
23 U.S.C. § 152(a)(1).

. The statute has since been amended by 2003 La. Acts, No. 725, § 1; 2003 La. Acts, No. 1077, § 1, effective July 2, 2003; and 2006 La. Acts, No. 545, § 1.

. Qualitative is defined as relating to or based on the quality or character of something, often as opposed to its size or quantity. See Webster’s Third New International Dictionary 1858 (Philip Babcock Gove, ed., G. & C. Merriam Company 1968).

. Mr. Bates described a compound curve as a curve that has an ever-increasing degree of curvature, meaning that it gets tighter and tighter as one goes around the curve.

. Although, as previously discussed, accident reports are considered hearsay and therefore incompetent, inadmissible evidence, Mr. Bates' testimony based on this evidence is nevertheless admissible. Article 703 of the Louisiana Code of Evidence provides "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be ... of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.” Comment (d) following the text of the article further provides "[u]nder this Article the facts or data underlying the expert witness' opinion may properly be: ... facts or data not admissible in evidence (because, for example, their source is inadmissible hearsay), if they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinions or inferences.” It has been held that accident reports are the kind of data reasonably relied upon by experts in the field of accident reconstruction. See Turner v. Lyons, 03-0186, pp. 4-6 (La.App. 4th Cir. 1/28/04), 867 So.2d 13, 17-18, writ denied, 04-0741 (La.5/14/04), 872 So.2d 530.

. We should point out that the DOTD is appealing the award of future medical expenses, which is subject to the manifest error standard of review, rather than the amount of future medical expenses, which would be subject to the abuse of discretion standard of review. Hymel v. HMO of Louisiana, Inc., 06-0042, p. 27 (La.App. 1st Cir.11/15/06), 951 So.2d 187, 206, writ denied, 06-2938 (La.2/16/07), 949 So.2d 425.

. The other doctors were Dr. Bruce L. Wilkerson and Dr. Paul M. Dammers. Dr. Wilkerson, a cardiothoracic surgeon, primarily treated Mr. Goza in the initial 40-day period right after the accident when he was hospitalized in the Baton Rouge General Medical Center. Dr. Dammers, a clinical, medical, and neuropsychologist, saw Mr. Goza on isolated occasions in 1996, 2000, and 2004 to evaluate him relative to his brain injury and memory problems.